THEODORE H. FRANK (SBN 196332)
COMPETITIVE ENTERPRISE INSTITUTE
  CENTER FOR CLASS ACTION FAIRNESS
1310 L Street NW 7th Floor
Washington, DC 20036
Voice: (202) 331-2263
Email: ted.frank@cei.org

*Attorney for Objector Alida Kass*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY BIRBROWER, an individual, | Case No. 2:16-cv-01346-DMG (AJW) |
| Plaintiff, | **OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT** |
| vs. | |
| QUORN FOODS, INC., a Delaware Corporation and DOES 1 through 100, inclusive, | Date:        September 1, 2017 |
| | Time:        10:30 a.m. |
| Defendant. | Location:   Courtroom 8C |
| Alida Kass, | |
| Objector. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

I.      The objector is a member of the class and has standing to object. .................... 2

II.     The Court has a fiduciary duty to the class ........................................................ 4

III.    Class members receive virtually nothing from the deliberately poor claims-made settlement. ............................................................................................................. 5

        A.      Deficient notice ensures that few class members file claims. ................ 7

        B.      Objector Kass filed claim number 2601, confirming low class recovery. ........... 8

IV.     Class counsel seeks an exorbitant 54% fees of a $2.5 million settlement that was reached before a single motion was argued. ....................................................... 9

        A.      In "economic reality," the settlement prioritizes attorneys' fees over class recovery ................................................................................................ 10

        B.      Opaque block billing makes evaluation of the claimed hours impossible. ........ 13

        C.      A multiplier is inappropriate here ......................................................... 14

V.      Cy pres distribution fails to compensate the class and should not be considered a class benefit .......................................................................................................... 16

VI.     Alleged injunctive relief provides no relief to class members, so cannot justify the waiver of their claims. .................................................................................. 17

        A.      Even for class members who review Quorn's slightly modified fine print, no evidence suggests they derive any benefit from it whatsoever ..................... 19

CONCLUSION ............................................................................................................ 21

# TABLE OF AUTHORITIES

## Cases

*Aichele v. City of L.A.*, No. 12-10863-DMG,
    2015 U.S. Dist. LEXIS 120225 (C.D. Cal. Sept. 9, 2015) .............................. 11, 15

*Allen v. Bedolla*,
    787 F.3d 1218 (9th Cir. 2015) ......................................................................... 11, 12

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ............................................................................................ 4, 5

*Banks v. Nissan N. Am., Inc.*, No. 11-cv-2022-PJH, 2015 WL 7710297,
    2015 U.S. Dist. LEXIS 160414 (N.D. Cal. Nov. 30, 2015) ................................... 11

*Bruno v. Quten Research Inst., LLC*, No. SACV 11-00173 DOC (Ex),
    2013 U.S. Dist. LEXIS 35066 (C.D. Cal. Mar. 13, 2013) ...................................... 14

*Cardinale v. Quorn Foods, Inc.*,
    2011 WL 2418628 (Conn. Super. Ct. May 19, 2011) ............................................. 10

*Churchill Vill., L.L.C. v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) .................................................................................... 5

*Crawford v. Equifax Payment Services, Inc.*,
    201 F.3d 877 (7th Cir. 2000) .................................................................................. 20

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012) ............................................................................. 5, 16

*FB-Stark, LLC v. White*, No. CV-12-0095-PHX-PGR,
    2012 U.S. Dist. LEXIS 137892 (D. Ariz. Sept. 26, 2012) ................................... 14

*Fischer v. SJB-P.D., Inc.*,
    214 F.3d 1115 (9th Cir. 2000) ................................................................................ 12

*Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08-cv-1992 AJB (MDD),
    2013 U.S. Dist. LEXIS 14105 (S.D. Cal. Feb. 1, 2013) ........................................ 14

*Glass v. UBS Financial Services*, No. C-06-4068 MMC,
    2007 WL 221862 (N.D. Cal. Jan. 26, 2007) .......................................................... 15

*Grunin v. International House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) .................................................................................... 4

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998)...............................................................5, 10

*Hunt v. Check Recovery Sys., Inc.*, No. C05-04993,
    2007 U.S. Dist. LEXIS 58800, 2007 WL 2220972 (N.D. Cal. July 25, 2007) ..... 7

*In re Baby Prods. Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013) ...........................................................16, 17

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ("*Bluetooth*").........................................*passim*

*In re Classmates.com*, No. 09-cv-0045-RAJ,
    2012 U.S. Dist. LEXIS 83480 (W.D. Wash. Jun. 15, 2012) .................................. 3

*In re Dry Max Pampers Litig.*,
    724 F.3d 713 (6th Cir. 2013) ("*Pampers*").........................................*passim*

*In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
    55 F. 3d 768 (3d. Cir. 1995) ("*GMC Pick-Up*") .................................4, 12

*In re Heartland Payment Sys., Inc.*,
    851 F. Supp. 2d 1040 (S.D. Tex. 2012) ...................................................... 17

*In re HP Inkjet Printer Litig.*,
    716 F.3d 1173 (9th Cir. 2013).................................................................. 10

*In re Mercury Interactive Corp.*,
    618 F.3d 988 (9th Cir. 2010)............................................................... 4, 9

*In re Pet Food Prods. Liab. Litig.*,
    629 F.3d 333 (3d Cir. 2010) ................................................................ 15

*In re Relafen Antitrust Litigation*,
    360 F.Supp.2d 166 (D. Mass. 2005)......................................................... 4

*In re Scotts EZ Seed Litig.*,
    304 F.R.D. 397 (S.D.N.Y. 2015) .......................................................... 20

*In re Thornburg Mortg., Inc. Sec. Litig.*, No. CIV 07-0815 JB/WDS,
    2012 WL 3150408, 2012 U.S. Dist. LEXIS 107934 (D.N.M. Jul. 24, 2012) ..... 17

*In re Washington Pub. Power Supply Sys. Lit.*,
    19 F.3d 1291 (9th Cir. 1994).................................................................. 4

*Klier v. Elf Atochem N. Am., Inc.*,
    658 F.3d 468 (5th Cir. 2011) ................................................................ 17

*Koby v. ARS Nat'l Servs.*,
    846 F.3d 1071 (9th Cir.2017) ................................................ 18, 19, 20, 21

*Larson v. AT&T Mobility LLC*,
    687 F.3d 109 (3d Cir. 2012) ................................................................... 8

*Mirfasihi v. Fleet Mortg. Corp.*,
    356 F.3d 781 (7th Cir. 2004) ................................................................. 12

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) ............................................................ 5, 16

*Nachshin v. AOL, LLC*,
    663 F.3d 1034 (9th Cir. 2011) ............................................................... 16

*Nguyen v. BMW of N. Am. LLC*, No. C 10-02257 SI,
    2012 U.S. Dist. LEXIS 56018 (N.D. Cal. Apr. 20, 2012) ........................ 14

*Nwabueze v. AT&T Inc.*, No. C 09-01529 SI,
    2014 U.S. Dist. LEXIS 11766 (N.D. Cal. Jan. 29, 2014) ........................ 11

*Otey v. Crowdflower, Inc.*, No. 12-cv-05524-JST,
    2014 U.S. Dist. LEXIS 52192 (N.D. Cal. Apr. 15, 2014) ........................ 13

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) .................................................... 2, 11, 19

*Perdue v. Kenny A*,
    130 S. Ct. 1662 (2010) ....................................................................... 15

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ............................................................................. 8

*Retta v. Millennium Prods.*, No. CV 15-1801 PSG,
    2016 U.S. Dist. LEXIS 152671 (C.D. Cal. Sept. 21, 2016) ........................ 5

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ................................................................. 4

*Richardson v. L'Oreal USA, Inc.*,
    991 F. Supp. 2d 181 (D.D.C. 2013) ......................................................... 2

*Silber v. Mabon,*
    957 F.2d 697 (9th Cir. 1992) ................................................................................. 4

*Six Mexican Workers v. Arizona Citrus Growers,*
    904 F.2d 1301 (9th Cir. 1990) ............................................................................. 10

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ........................................................................... 5, 12

*True v. Am. Honda Co., Inc.,*
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) .......................................................... 5, 18

*Van Horn v. Nationwide Prop. & Cas. Ins. Co.,*
    436 Fed. Appx. 496 (6th Cir. 2011) ................................................................... 15

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ......................................................................................... 8

*Weeks v. Kellogg Co.,* No. 09-cv-8102,
    2011 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23, 2011) ........................... 15, 17

*Weinberger v. Great N. Nekoosa Corp.,*
    925 F.2d 518 (1st Cir. 1991) .............................................................................. 13

*Zucker v. Occidental Petroleum Corp.,*
    968 F. Supp. 1396 (C.D. Cal. 1997) .................................................................. 14

**Rules and Statutes**

Rule 23(b)(3) .............................................................................................................. 7

Rule 23(c)(2)(B) ......................................................................................................... 7

Rule 23(e) .......................................................................................................... *passim*

Rule 23(h) ............................................................................................................. 9, 15

Notes of Advisory Committee on 2003 Amendments to Rule 23 .............................. 11

15 U.S.C. §§ 77z-1(a)(6) .......................................................................................... 11

15 U.S.C. §§ 78u-4(a)(6) .......................................................................................... 11

**Other Authorities**

American Law Institute, *Principles of the Law of Aggregate Litig.* (2010)
    ("ALI Principles")..................................................................................5, 11, 16, 17

Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*,
    2003 U. CHI. LEGAL F. 403 (2003)............................................................ 3

Ronald L. Burdge,
    *United States Consumer Law Attorney Fee Survey Report*, 2013-14 ............................ 14

Evan Bush, *Your grocery bill may help King County track unlicensed pets*,
    SEATTLE TIMES (Nov. 2, 2016) .................................................................. 7

Federal Judicial Center,
    MANUAL FOR COMPLEX LITIGATION (Fourth) (2004) ........................................ 11

Brian T. Fitzpatrick, *The End of Objector Blackmail?*,
    62 VAND. L. REV. 1623 (2009) ................................................................. 3

Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011) ....... 3

Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*,
    N.Y. Times, Aug. 13, 2013, at A12.............................................................. 2

Herbert Newberg & Alba Conte,
    4 NEWBERG ON CLASS ACTIONS (4th ed. 2002)................................................ 4, 5

## INTRODUCTION

Opinions on mold differ. Diners disagree about whether the savory blue veins of Roquefort cheese are tasty. Some people enjoy cuitlacoche, and most will use soy sauce. But a settlement that reserves 54% of the judgment for attorneys and only spores to the class is universally revolting and must be rejected under binding Ninth Circuit precedent.

The settling parties know that defendant Quorn Foods, Inc. ("Quorn") will not pay more than $2.5 million under the proposed settlement. Zero class members receive direct notice under the agreement, and less than 1% of class members file claims in the absence of such notice. The few who do learn about the settlement are deterred by the claims process, which requires unrealistic documentation for every $5 claim. If the parties actually believed that hundreds of thousands of class members would file claims, there would be no reason to select a *cy pres* recipient because claims would easily exceed the "initial fund." Few people retain grocery receipts for years on end, so when class counsel argues that five years' worth of full refunds of $120 million have been made available to class members, it's an "alternative fact" shilled for the sole purpose of justifying a disproportionate fee request, and one irrelevant as a matter of law under binding Ninth Circuit precedent. Objector Alida Kass was given claim number 2601, which suggests class recovery will be predictably outstripped by attorneys' fees.

Kass is not arguing that Quorn must settle for $120 million or $12 million rather than $2.5 million. But if the parties feel the litigation so feeble that a $2.5 million settlement is adequate, Rule 23(e)'s fairness requirement and Ninth Circuit law forbids class counsel from self-dealing to receive the lion's share of the settlement value. Class counsel has endeavored to receive 54% of funds under the settlement by negotiating a clear-sailing agreement so that Quorn will not oppose counsel's $1.35 million fee request, which represents an astonishing blended rate of $2593/hour for a compromise that leaves over 99% of the class uncompensated. If one appropriately excludes *cy pres* from the settlement value, class counsel will be receiving many times what the class is receiving. Disproportionate fees and lack of meaningful injunctive relief render the settlement unfair and unreasonable. The parties

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

negotiated a settlement to give disproportionate recovery to attorneys with clear sailing, which are both red flags under *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) ("*Bluetooth*").

Because of the settlement's structural defects, the Court cannot make it palatable by trimming the crust off of attorneys' fees. Objector Kass urges the Court to toss out the proposed settlement in its entirety.

## I.     The objector is a member of the class and has standing to object.

Objector Alida Kass is a member of the class. Kass resides at 37 Elmwood Avenue, Chatham, NJ, and her phone number is 609-649-4067.  *See* Declaration of Alida Kass ("Kass Decl.") at ¶ 2.

Kass intends to appear at the September 1, 2017 fairness hearing through her *pro bono* attorney Theodore H. Frank of the Competitive Enterprise Institute's Center for Class Action Fairness ("CCAF"). Frank is a member of the bar of the Central District of California.

CCAF represents class members *pro bono* in class actions where class counsel employs unfair class action procedures to benefit themselves at the expense of the class. *See e.g., Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (observing that CCAF "flagged fatal weaknesses in the proposed settlement" and demonstrated "why objectors play an essential role in judicial review of proposed settlements of class actions"); *In re Dry Max Pampers Litig.* ("*Pampers*"), 724 F.3d 713, 716-17 (describing CCAF's client's objections as "numerous, detailed, and substantive.") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement.") (rejecting settlement approval and certification); Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES, Aug. 13, 2013, at A12 (calling Frank "[t]he leading critic of abusive class-action settlements").

Since its founding in 2009, CCAF has won over $100 million for class members. *See, e.g., In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480, at *29 (W.D. Wash. Jun. 15, 2012) (noting that CCAF's client "was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel… at the expense of class members" and "significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second").

Because it has been CCAF's experience that class action attorneys often employ *ad hominem* attacks in attempting to discredit objections, it is perhaps relevant to distinguish CCAF's mission from the agenda of those who are often styled "professional objectors." A "professional objector" is a specific term referring to for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees. Some courts presume that such objectors' legal arguments are not made in good faith. Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. CHI. LEGAL F. 403, 437 n.150 (2003). This is not CCAF's *modus operandi*. Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: CLASS ACTION LITIG. REPORT (Aug. 12, 2011) (distinguishing CCAF from professional objectors). CCAF refuses to engage in *quid pro quo* settlements and does not extort attorneys; and has never withdrawn an objection in exchange for payment. Instead, it is funded entirely through charitable donations and court-awarded attorneys' fees. *See generally* Declaration of Theodore H. Frank.

To avoid doubt about her motives, Kass is willing to stipulate to an injunction prohibiting her from accepting compensation in exchange for the settlement of her objection. *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem). Kass brings this objection through CCAF in good faith to protect the interests of the class. Kass Decl. at ¶ 12.

At this time, Kass does not intend to call any witnesses at the fairness hearing, but reserves the right to make use of all documents entered on the docket by any settling party, objector, or *amicus*, including exhibits filed by proposed *amicus* Center for Science in the Public

Interest ("CSPI") and attached to the Kass and Bednarz Declarations. Objector Kass also reserves the right to cross-examine any witnesses who testify at the hearing in support of final approval.

## II.     The Court has a fiduciary duty to the class.

A district court must act as a "fiduciary for the class," "with 'a jealous regard'" for the rights and interests of absent class members. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994-95 (9th Cir. 2010) (quoting *In re Washington Pub. Power Supply Sys. Lit.,* 19 F.3d 1291, 1302 (9th Cir. 1994)). "Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166, 192-94 (D. Mass. 2005), citing *inter alia Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'"); *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279-80 (7th Cir. 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions" prior to settlement).

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members....[T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.* ("*GMC Pick-Up*"), 55 F.3d 768, 785 (3d. Cir. 1995) (quoting *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir. 1975)). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, 4 NEWBERG ON CLASS ACTIONS § 13:20 (4th ed. 2009). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon,* 957 F.2d 697, 701 (9th Cir. 1992).

There should be no presumption in favor of settlement approval: "[t]he proponents of a settlement bear the burden of proving its fairness." *True v. Am. Honda Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (*citing* 4 NEWBERG ON CLASS ACTIONS § 11:42 (4th ed. 2009)); *Retta v. Millennium Prods.*, No. CV 15-1801 PSG, 2016 U.S. Dist. LEXIS 152671, at *11 (C.D. Cal. Sept. 21, 2016) (such presumption would be "inconsistent with *Hanlon*'s emphasis on a probing inquiry") (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998)). *Accord* American Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) ("ALI Principles").

"[W]here the court is '[c]onfronted with a request for settlement-only class certification,' the court must look to the factors 'designed to protect absentees.'" *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (quoting *Amchem*, 521 U.S. at 620). "[S]ettlements that take place prior to formal class certification require a higher standard of fairness." *Id.* "[P]re-certification settlement agreements require that we carefully review the entire settlement, paying special attention to 'terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact influenced the outcome of the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 867 (9th Cir. 2012) (quoting *Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003)). "These concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." *Hanlon*, 150 F.3d at 1021; *Bluetooth*, 654 F.3d at 947. Where the Court confronts a pre-certification settlement, consideration of the eight *Churchill* factors[1] "alone is not enough to survive appellate review." *Bluetooth*, 654 F.3d at 946.

## III. Class members receive virtually nothing from the deliberately poor claims-made settlement.

Class counsel premises its fee request on the notion that it has provided the class full refunds worth $120 million, but the settling parties know full well this number is an "alternative fact" bearing no relation to reality. Such recovery is impossible even if notice were adequate

---

[1] *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

because it presumes each and every class member can provide documentation. They cannot, and the settling parties know that few rational class members will file claims.

To receive one moldy cent from the settlement, class members must provide either (1) itemized receipts showing purchase of Quorn, or (2) alternative documentation such as a credit card statement showing payment to a retailer that sells Quorn. Because hardly anyone saves grocery receipts for six years, the more important mechanism is the "alternative," which caps claims at $5 per statement, one per month and $40 per year, for a hypothetical maximum claim of $200.  To receive the maximum, class members must submit a total of forty credit card statements showing payments over a five-year period. Considering that the settlement administrator estimates 61% of class members have household income greater than $75,000 a year[2]—much higher than the national average—it is simply a waste of time for class members to master the intricate claims process, locate old credit card statements, and find relevant charges for a speculative one-time payment. Parties are presumed to intend the foreseeable consequences of their actions, and the hoop-jumping required here is intended to throttle the number of claims class members file.

Claims in low-stakes settlements without direct notice are notoriously low. An analysis by Kurtzman Carson Consultants, one of the countries' largest settlement administrators, found that the claims rate in all consumer class actions settlements they administered without direct mail notice had a median claims rate of less than 0.25%. *See* Declaration or M. Frank Bednarz ("Bednarz Decl.") ¶ 6 & Ex. 2. Class counsel is perfectly aware of this reality, yet chose to craft a settlement few would participate in and pass it off as a "$120 million" constructive common fund. *See* Memorandum in Support of Plaintiff's Motion for Attorneys' Fees ("Fee Memo"), Dkt. 45-1 at 5. Quorn's only liability will be the $2.5 million fund—and more of that will likely go to *cy pres* than to the class.

---

[2] *See* Declaration of Christopher Longley ("Longley Decl."), Dkt. 32-7, at 15 of 59.

**A.       Deficient notice ensures that few class members file claims.**

A class action certified under Rule 23(b)(3) must provide "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Rule 23(c)(2)(B).

Absolutely no individual notice was provided to class members in this suit, nor was any effort—let alone reasonable effort—made to identify class members. In a settlement class counsel self-servingly claims to be worth $120 million, plaintiffs can quite reasonably subpoena retailers to learn the identities of many other class members through loyalty programs and direct internet sales.[3] Many grocers retain customer purchase information through shopper loyalty programs, as do grocery delivery services such as Amazon Fresh, Envoy, Peapod, and Instacart (all of which sell Quorn in multiple cities). Objector Kass quite likely could have been provided individual notice had consumer data been sought from Stop & Shop or its corporate parent Ahold USA, Inc., which also owns Peapod. *See* Kass Decl. ¶ 9. Class counsel lacks any excuse for failing to make even token efforts to identify its putative clients. "Class representatives must be prepared, at the outset of the suit, to accept the responsibility of identifying absentee class members and paying for their individual notice." *Hunt v. Check Recovery Sys., Inc.*, No. C05-04993, 2007 U.S. Dist. LEXIS 58800, at *13, 2007 WL 2220972, at *4 (N.D. Cal. July 25, 2007).

Contrary to class counsel's assertion, Quorn *does* possess customer contact information of likely customers, which at bare minimum should have been used. In particular, Quorn possess customer complaints and inquiries sent by email, letter, or telephone, and via the "Quorn USA Champions" email list and loyalty program.[4] That the parties did not use even

---

[3] For example, King County, Washington purchased such marketing data in order to identify unlicensed pet owners. *See* Evan Bush, *Your grocery bill may help King County track unlicensed pets*, SEATTLE TIMES (Nov. 2, 2016), available at: http://www.seattletimes.com/life/pets/your-grocery-bill-may-help-king-county-track-unlicensed-pets/.

[4] *See* Quorn USA, "Contact Us" at http://www.quorn.us/contact/.

this low-hanging fruit to provide virtually free email notice suggests that the parties sought to avoid class participation altogether. This failure renders notice constitutionally deficient.

Absent class members have a due process right to notice and an opportunity to opt out. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 & n.3 (1985); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558-59 (2011). "[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is, rather, an unambiguous requirement of Rule 23." *Larson v. AT&T Mobility LLC*, 687 F.3d 109, 128 (3d Cir. 2012) (remanding settlement to evaluate adequacy of notice where defendant's records not used to provide individual notice).

The notice program relies entirely upon internet banner advertising, and the results of the program speak for themselves. Neither Objector Kass nor any of the 14 class members who responded to CSPI's emails has received notice of the settlement. *See* Kass Decl. ¶ 9; Jacobson Decl., Dkt. 46-3 ¶ 24. The Settlement Administrator's claim that notice in this case would achieve "an approximate 75% reach with an average frequency of 2.75 times for each Class Member" (Longley Decl. ¶ 8) seems doubtful given these data,[5] so should not be credited.

**B.      Objector Kass filed claim number 2601, confirming low class recovery.**

On March 15, Objector Kass received claim form number 2601 from the settlement administrator. *See* Kass Decl. ¶ 6 & Ex. 1. If claims were numbered sequentially starting from 1, the claim number suggests that less than $520,005 in benefits were claimed by March 15 (and only in the unlikely event all claimants filed either itemized grocery receipts or forty credit card statements to receive $200 each). If one assumes a similar claims rate for the duration of the claims period even at the overly optimistic $200/claimant amount, class members would claim only about $1.3 million in total benefits. More likely, much less than $200,000 will be claimed.

---

[5] The odds that fifteen out of fifteen class members would, by random chance, not receive notice from a program with "75% reach" is (1-0.75) to the fifteenth power, or less than one in a billion. Whatever the settlement administrator is defining "reach" as, it is not actually the measurement of class members learning about a settlement.

Many class members, like Ms. Kass, might claim only $5 for a single month, given the trouble of submitting forty credit card statements or dozens of ancient grocery receipts.

Notably, the settlement administrator proposed that the digital advertising component of notice would cease on March 15. *See* Longley Decl., Dkt. 32-7 at 17 (showing intended four-week duration of paid media). Any additional claims going forward are more likely attributable to CSPI's publicity or expected publicity generated by CCAF for Kass's objection than the settlement's notice plan.

Objector Kass reserves the right to supplement her objection after class counsel provides the status of claims on April 28 and again when the final claims are disclosed with the motion for final approval on June 30. *See generally In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (reversible error to withhold information material to Rule 23(h) question from class until after objection deadline without giving class members reasonable opportunity to respond).

**IV.    Class counsel seeks an exorbitant 54% fees of a $2.5 million settlement that was reached before a single motion was argued.**

Given that the total size of the settlement will be $2.5 million, the clear sailing that class counsel negotiated for their $1.35 million fee request renders the settlement unfair and unreasonable under Ninth Circuit precedent.

Class counsel says that their fee request is justified due to their supposed creation of a $120 million constructive common fund, but their actions prove otherwise. If such a common fund existed, class counsel would have a fiduciary responsibility to see it used for the benefit of the class. For comparison, imagine that a trustee had a fund of $120 million, but agreed to give $117.5 million to an alleged wrongdoer if unidentified beneficiaries don't click on internet banner ads to claim their share of the fund. Such process would constitute a breach of fiduciary duty. So it is here, although on a smaller scale because the settlement could never plausibly provide $120 million. In fact, class counsel has agreed to a $2.5 million settlement with Quorn—one where the attorneys stand to gain most of the benefit.

There is nothing wrong with a relatively small settlement, but Ninth Circuit law forbids class counsel from diverting most the settlement's value to themselves. If the claims are weak, $2.5 million may be an appropriate valuation of the case.[6] But if that's so, fairness under Rule 23(e) requires that class members—not attorneys—receive most recovery. Counsel may not game the system by agreeing to a claims process and notice plan that freezes out virtually all class members while providing royal treatment for attorneys' fees.

### A.    In "economic reality," the settlement prioritizes attorneys' fees over class recovery.

This settlement features two indicia identified by the Ninth Circuit as suggesting an inequitable distribution between counsel and the class in violation of Rule 23. *See Bluetooth,* 654 F.3d at 947 (listing the indications: (1) a disproportionate distribution of fees to counsel; and (2) a "clear sailing agreement" that defendants will not challenge the fee request).

The most telling sign of self-dealing in this settlement is counsel's receipt of an exceedingly "disproportionate distribution of the settlement." *Bluetooth*, 654 F.3d at 947 (quoting *Hanlon*, 150 F.3d at 1021). The benchmark for a reasonable award in the Ninth Circuit in a case alleging economic injury is 25% of the class benefit. *See, e.g., Bluetooth*, 654 F.3d at 942; *In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1190 (9th Cir. 2013); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). Here, plaintiffs alleged an economic injury, yet the class's claims would be released for perhaps a few hundred thousand dollars and "injunctive relief" that does not benefit any class member. In other words, the proposed settlement awards over 54% and possibly over 75% of the class benefit to attorneys—far in excess of this Circuit's benchmark or any reasonable measurement of fairness.

Objector Kass agrees with class counsel that fees awarded as a percentage of the fund "more closely aligns the interests of the counsel and the class, i.e., class counsel directly benefit

---

[6] For example, a putative class action against Quorn was dismissed due to federal preemption. *See Cardinale v. Quorn Foods, Inc.*, 2011 WL 2418628, 2011 Conn. Super. LEXIS 1262 (Conn. Super. Ct. May 19, 2011). *Amicus* CSPI described itself as co-counsel in this case. *See* Bednarz Decl. Ex. 3.

OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT

from increasing the size of the class fund and working in the most efficient manner." Fee Memo. at 4; *Aichele v. City of L.A.*, No. 12-10863-DMG, 2015 U.S. Dist. LEXIS 120225, at *15 (C.D. Cal. Sept. 9, 2015). But to ensure that interests are actually aligned, the fund must represent *actual* class recovery. *See* Notes of Advisory Committee on 2003 Amendments to Rule 23 ("it may be appropriate to defer some portion of the fee award until *actual payouts* to class members are known" (emphasis added)); *id.* ("fundamental focus is the result *actually achieved* for class members" (emphasis added); *id.* (citing 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest *actually paid* to the class" (emphasis added))). *See also* ALI Principles § 3.13; Federal Judicial Center, Manual for Complex Litigation (Fourth) § 21.71(2004) ("the fee awards should be based only on the benefits *actually delivered*."). "[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." *In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283, 338 (3d Cir. 1998). Thus, the relevant ratio for determining attorneys' fees is "(1) the fee to (2) the fee plus what the class members received." *Pearson v. NTBY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014) (internal quotation marks omitted). Otherwise, class counsel has an incentive to "connive with the defendant in formulating claims-filing procedures that discourage filing and so reduce the benefit to the class." *Id.*; *Allen v. Bedolla*, 787 F.3d 1218, 1224 n.4 (9th Cir. 2015) (vacating and remanding for examination "in terms of 'economic reality,'" where low claims rate resulted in class recovery less than fee award).

Class counsel's own citations support using actual claims to evaluate the "constructive common fund." *See Aichele*, 2015 U.S. Dist. LEXIS 120225, at *15 ("where portions of the class fund revert to Defendants, [it] result[s] in a highly disproportionate fee in relation to the actual (as opposed to theoretical) monetary recovery of the class."); *Nwabueze v. AT&T Inc.*, No. C 09-01529 SI, 2014 U.S. Dist. LEXIS 11766, at *9 (N.D. Cal. Jan. 29, 2014) (performing percentage of fund cross-check using actual claims to be paid by defendant); *Banks v. Nissan N. Am., Inc.*, No. 11-cv-2022-PJH, 2015 WL 7710297, 2015 U.S. Dist. LEXIS 160414, at *41 (N.D.

Cal. Nov. 30, 2015) (denying final approval per *Bluetooth* where attorneys' fees dwarfed actual claims).

In this case the "$120 million" result claimed by class counsel doesn't just revert to the defendant; it will never be paid at all. The court may not ignore the "'economic reality,' [that] the award exceeds the maximum possible amount of class monetary relief." *Allen*, 787 F.3d at 1224 (vacating approval of settlement where most funds reverted to defendant).

A class action settlement may not confer preferential treatment upon class counsel to the detriment of class members. "Such inequities in treatment make a settlement unfair" for neither class counsel nor the named representatives are entitled to disregard their "fiduciary responsibilities" and enrich themselves while leaving the class behind. *Pampers*, 724 F.3d at 718-21 (reversing settlement where class counsel received $2.73 million and absent class members were offered a money-back refund program with a likely small claims rate, prospective labeling changes, and a *cy pres* donation).

Disproportionate fees suggest self-dealing, which infects the entire settlement, not just the fee request. To be lawyer-driven and self-dealing, a settlement need not be collusive. Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests…to infect the negotiations." *Bluetooth*, 654 F.3d at 947 (citing *Staton*, 327 F.3d at 960); *see also id.* at 948 ("the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations."). There need only be acquiescence for such self-dealing to occur: "a defendant is interested only in disposing of the total claim asserted against it" and "the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *Staton*, 327 F.3d at 964 (quoting *GMC Pick-Up*, 55 F.3d at 819-20); *accord Bluetooth*, 654 F.3d at 949; *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004).

"If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Staton*, 327 F.3d at 964; *accord Bluetooth*, 654 F.3d at 947.

This is the case here, where the class obtains token recovery whereas class counsel applies for $1.35 million in attorney fees with clear sailing. That is, Quorn agreed in advance not to oppose any fee request by class counsel. *See* Settlement Agreement, Dkt. 32-2, at 23.[7] Such a clause, by its "'very existence'" "'increases the likelihood that class counsel will have bargained away something of value to the class.'" *Bluetooth*, 654 F.3d at 948 (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991)). Clear sailing lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees" and "suggests, strongly, that the fee request [should] be placed under the microscope of judicial scrutiny." *Weinberger*, 925 F.2d at 518, 524-25.

**B.      Opaque block billing makes evaluation of the claimed hours impossible.**

While fees should be awarded as a percentage of actual class recovery, class counsel's proposed lodestar crosscheck is woefully deficient. Class counsel's failure to submit any breakdown of hours worked prevents class members and the Court from evaluating the reasonableness of those hours, and so should prevent the award of attorneys' fees on the basis of lodestar. *See, e.g., Otey v. Crowdflower, Inc.*, No. 12-cv-05524-JST, 2014 U.S. Dist. LEXIS 52192, at *26 (N.D. Cal. Apr. 15, 2014) ("The Court is…unable to determine whether the hours spent are reasonable, because Plaintiffs' counsel have provided no evidence or itemized records to support the hours they worked."). Class counsel has failed to meet the bare minimum of "listing [its] hours and identifying the general subject matter of [its] time expenditures." *Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000). Class counsel has not even listed a breakdown of hours *by attorney*, let alone subject matter or date of work.

Class counsel's sketchy billing also raises two concerns. *First*, the lodestar is distended and unreasonably top-heavy, to the extent that the entire blended hourly rate of the lodestar figure exceeds $918/hour. Jason Frank declares that two attorneys at his firm billed 292.8 hours for a total lodestar of $255,782 ($874/hour blended rate), while two attorneys at Yuhl Carr

_____

[7] The pages of the Settlement Agreement lack numbers, so citations herein use the page numbers provided by ECF.

LLP billed 227.8 hours for a lodestar of $222,280 ($978/hour blended rate). These are astonishingly high average rates and they imply senior attorneys performed all activity on the case, even ministerial matters that would normally be performed by paralegals, like arranging for service of the complaint. *See, e.g., FB-Stark, LLC v. White*, No. CV-12-0095-PHX-PGR, 2012 U.S. Dist. LEXIS 137892, at *4-*5 (D. Ariz. Sept. 26, 2012) (criticizing partner who performed tasks "that could have, and should have, been done by the lesser-paid employees who worked on this litigation, such as the two associate attorneys and the paralegal assigned to the case"); *Zucker v. Occidental Petroleum Corp.*, 968 F. Supp. 1396, 1402 (C.D. Cal. 1997) ("[L]egal research [is] a task that most certainly could have been tackled by an associate billing at a lower rate."). In the absence of such improper practices, one would expect the blended rate to be closer to the normal blended rate in this area. *See, e.g., Bruno v. Quten Research Inst., LLC*, No. SACV 11-00173 DOC (Ex), 2013 U.S. Dist. LEXIS 35066, at *9 (C.D. Cal. Mar. 13, 2013) (class counsel's blended rate was $366.87/hour); *Nguyen v. BMW of N. Am. LLC*, No. C 10-02257 SI, 2012 U.S. Dist. LEXIS 56018, at *9 (N.D. Cal. Apr. 20, 2012) (finding reasonable blended rate to be $470/hour); *Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08-cv-1992 AJB (MDD), 2013 U.S. Dist. LEXIS 14105, at *33-*34 (S.D. Cal. Feb. 1, 2013) (finding Cooley LLP's blended rate of $447/hour to be "in line with that of the community" when compared to peers in Los Angeles, Silicon Valley, San Francisco, and San Diego); *see also* Ronald L. Burdge, *United States Consumer Law Attorney Fee Survey Report*, 2013-14, 80, *available at* https://www.nclc.org/images/pdf/litigation/fee-survey-report-2013-2014.pdf (describing typical Los Angeles consumer law attorney billing rates).

*Second*, lodestar multipliers are no longer granted as a matter of course.

## C.     A multiplier is inappropriate here.

Class counsel requests a lodestar multiplier of 2.8, for an effective blended rate of $2593/hour, but *any* multiplier would be excessive even if counsel's base hourly rates were reasonable (which they are not).

"[T]here is a strong presumption that the lodestar is sufficient" without an enhancement multiplier. *Perdue v. Kenny A*, 130 S. Ct. 1662, 1669 (2010). A lodestar enhancement is only justified in "rare and exceptional" circumstances where "specific evidence" demonstrates that an unenhanced "lodestar fee would not have been adequate to attract competent counsel." *Id.* at 1674. *Kenny A*'s limitation on enhancements was made in the context of interpreting 42 U.S.C. § 1988's language of "reasonable" fee awards, but there's little justification for claiming that "reasonable" in § 1988 means something different than "reasonable" in class action fee awards made under Fed. R. Civ. P. 23(h). *See, e.g., Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 Fed. Appx. 496, 500 (6th Cir. 2011); *Weeks v. Kellogg Co.*, No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472, at *129-*135 & n.157 (C.D. Cal. Nov. 23, 2011) (citing *Kenny A* and finding "little basis for an application of a multiplier" when calculating lodestar cross-check); *cf. also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 361 (3d Cir. 2010) (Weis, J. concurring/dissenting) (referring to *Perdue* as an "analogous statutory fee-shifting case."). *Vizcaino*, the only case cited by class counsel as supporting "the 3 to 4 times multiplier range approved in class action settlements of this size" (Fee Memo. at 11), predates *Kenny* by eight years.[8]

Class counsel's reliance on *Aichele v. City of L.A.* similarly does not support their position since attorneys in that case sought and received *less* than full lodestar. *See* 2015 U.S. Dist. LEXIS 120225 at *21.

Objector Kass reserves her right to supplement her objection should class counsel provide detail necessary to evaluate the lodestar figure, including descriptions and date of work. The date of work is important because it appears that many of the claimed hours must have been performed after an agreement in principle had been reached. For example, the deposition

---

[8] In a similar vein, class counsel analogizes this early settlement with the settlement in *Glass v. UBS Financial Services*, No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007). Fee Memo at 9-10. In *Glass*, the district court approved a settlement with clear sailing for attorneys' fees and a kicker (i.e. reversion to defendant), which objectors and the Attorney General of New York correctly argued were questionable features. The subsequent *Bluetooth* opinion requires a higher level of scrutiny be applied to settlements with these features. In any event, 51% of the class members in *Glass* filed claims, which bears little resemblance to the proposed settlement here.

of Sanjay Panchal occurred on October 19, 2016—almost two months after the parties announced they were drafting a settlement agreement. Excerpts of the 43-page "confirmatory" deposition suggest that it was performed solely to provide a record for the restrictive terms of the Settlement Agreement, including class counsel's failure to provide individual notice to any class member. *See* Jan. 6, 2017 Jason Frank Decl. (Dkt. 32-5), Ex. 1. This information is required to perform a lodestar cross-check. *See Nwabueze v. AT&T Inc.*, 2013 WL 6199596, 2013 U.S. Dist. LEXIS 169270, at *38 (N.D. Cal. Nov. 27, 2013) (cited by Fee Memo at 4, 5) (finding billing information inadequate because "there is no information regarding the nature of the tasks performed, or when they were performed — that is, before or after settlement was reached").

## V. *Cy pres* distribution fails to compensate the class and should not be considered a class benefit.

Given that few class members will receive money from the settlement, the "non-reversionary" *cy pres* payment under the settlement agreement will likely constitute most of the $1 million dollars not earmarked by the Settlement Agreement for administration and attorneys' fees. This money should not be attributed to class counsel and ought not count when evaluating the allocation of attorneys' fees.

Non-compensatory *cy pres* distributions, disfavored among courts and commentators alike, remain an inferior avenue of last resort. *See e.g.*, *Dennis*, 697 F.3d at 868 (cy pres settlement can easily become "a paper tiger"); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) ("[A] growing number of scholars and courts have observed, the *cy pres* doctrine…poses many nascent dangers to the fairness of the distribution process") (citing authorities); *Molski*, 318 F.3d at 955 (holding *cy pres* to be an inadequate substitute for individual compensation); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013) ("*Cy pres* distributions imperfectly serve that purpose by substituting for that direct compensation an indirect benefit that is at best attenuated and at worse illusory"); ALI Principles § 3.07 cmt. b (2010) (rejecting position that "*cy pres* remedy is preferable to further distributions to class members"). Thus, the mere

existence of the *cy pres* doctrine in the class-action context is controversial with good reason. *See generally In re Thornburg Mortg., Inc. Sec. Litig.*, No. CIV 07-0815 JB/WDS, 2012 WL 3150408, 2012 U.S. Dist. LEXIS 107934 (D.N.M. Jul. 24, 2012). "Class members are not indifferent to whether funds are distributed to them or to cy pres recipients." *Baby Prods.*, 708 F.3d at 178.

Class members should be the "foremost beneficiaries" of the settlement. *Id.* at 179. "If the settlement involves individual distributions to class members and funds remain after distributions…the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair." ALI Principles § 3.07(b). This rule follows from the precept that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011).

A dollar that goes to *cy pres* is less valuable to the class than a dollar that goes directly to a class member, and so should be discounted when evaluating class counsel's fee request. *Cf. Weeks v. Kellogg Co.*, No. CV 09-08102, 2011 U.S. Dist. LEXIS 155472, at *103-*104 (C.D. Cal. Nov. 23, 2011) (discounting *cy pres* for purposes of awarding fees); *In re Heartland Payment Sys., Inc.*, 851 F. Supp. 2d 1040, 1077 (S.D. Tex. 2012) (same). After all, class counsel drafted a settlement that prioritizes attorneys' fees, provides pitiful notice, and deters class members from filing claims. Every dollar paid to *cy pres* under the proposed settlement represents a dollar that could have been paid to class members if counsel had structured a $2.5 common fund with proportional fees and *pro rata* distribution to class members. Counsel should not be rewarded for disfavoring their own putative clients.

## VI.   Alleged injunctive relief provides no relief to class members, so cannot justify the waiver of their claims.

The alleged injunctive relief provides no relief to the class, so based upon controlling Ninth Circuit authority cannot be relied upon to approve the settlement. The proponents of a

settlement must bear "the burden of demonstrating that class members would benefit from the settlement's injunctive relief." *Koby v. ARS Nat'l Servs.*, 846 F.3d 1071, 1080 (9th Cir.2017); *Pampers*, 724 F.3d at 719 (compiling authorities).

The parties have not and cannot satisfy this burden. The purported injunctive relief to the class is neither relief, nor is it directed to the class. The settling parties provide only conclusory statements that these provisions have value, and this is inadequate to find a settlement fair.

In *Koby*, the parties argued that a class would benefit from the modification of collection practices by the defendant, but the injunction provided the class no particular benefit. Instead, the injunction applied to all *future* debtors contacted by the defendant, whether or not they were class member, which was "an obvious mismatch between the injunctive relief provided and the definition of the proposed class." *Id.* at 1079.

Precisely such a mismatch exists here. The class includes people who have purchased Quorn in the past, but the only conceivable beneficiaries of label changes are *future* customers. As in *Koby*, the fact that a class member purchased Quorn between 2012 and 2016 "does not without more establish that he or she would likely" (*id.*) to purchase Quorn in after the label modification "phase in period" ends in 2018. *See* Settlement Agreement, Dkt. 32-2 at 16.

Under the proposed settlement, as in *Koby*, all consumers will receive the same dubious relief—the deletion of four words and slight rearrangement of five words on the defendant's packaging and website. Even if this were valuable, and even if class counsel was not the primary beneficiary of the agreement, this "relief" is conferred on *all* future Quorn consumers, regardless of class membership. Changes in future fine print disclosure will *not* benefit class members who, by definition, are past purchasers already allegedly misled by the Defendants' previous conduct. *Id.*; *True v. Am. Honda Co.*, 749 F. Supp. 2d 1052, 1077 (C.D. Cal. 2010) ("No changes to future advertising by Honda will benefit those who already were misled by Honda's representations regarding fuel economy."); *Pampers*, 724 F.3d at 720 ("The fairness of the settlement must be evaluated primarily on how it *compensates class members*—not on whether it provides relief to other people, much less on whether interferes with defendant's marketing

plans.") (cleaned up). "Future purchasers are not members of the class, defined as it is as consumers who have purchased [the product]." *Pearson*, 772 F.3d at 786.

Evidence provided by class counsel suggests, if anything, that there is relatively little overlap between past and future customers. The vast majority of Quorn purchasers are highly infrequent customers.[9] By far, the largest group of Quorn consumers among meat substitute shoppers are classified as "switchers," who on average purchased *two* Quorn packages in the last year.[10] The parties' own data show that most class members have purchased very little Quorn, and may have only bought on a lark or due to an extraordinarily good sale. There is no reason to believe such consumers—typical class members—will ever review the fine print on a Quorn package in the future.

Given this state of affairs, the settlement puts non-claiming class members in a worse position than non-class members. Non-claiming class members are being compelled "to relinquish their right to seek damages in any other class action" only to to enjoy the same "relief" all consumers will enjoy. *Koby*, 846 F.3d at 1071. Because the settlement provides no marginal consideration to these unnamed class members, it is against their interests and should not be approved.

### A. Even for class members who review Quorn's slightly modified fine print, no evidence suggests they derive any benefit from it whatsoever.

Even among those who might read Quorn fine print in the future, "the named plaintiffs provided no evidence to suggest that many, if any, members of the proposed class would derive

---

[9] According to class counsel, "Quorn's most loyal customers" comprise a small group of about 79,000 shoppers in the meat alternative category, who spend an average of $41.47 on Quorn annually. *See* Fee Memo. at 17; Jason. Frank Decl. (Dkt. 45-2) ¶ 14 & Ex. 4 at 30:25-31:22. This means that "high loyal" customers buy only about $3.3 million of Quorn annually, out of sales class counsel estimates to be $120 million over five years, or $24 million per year. *See* Jason. Frank Decl. (Dkt. 45-2) ¶ 16.

[10] Jason. Frank Decl. (Dkt. 45-2), Ex. 9 (showing $9.55 annual sales among "switchers"). Presumably, shoppers outside of the meat alternative "category" are even less frequent buyers. For example, people who purchase meat substitutes to accommodate vegan or vegetarian relatives over holidays.

a benefit from obtaining the injunctive relief afforded by the settlement." *Koby*, 846 F.3d at 1080. Class counsel makes no attempt to demonstrate any benefit, and simply asserts without argument that injunctive relief constitutes "significant non-monetary relief" and "significant benefit." Fee Memo. at 1, 7.

In fact, making such a showing is impossible because meaningless marketing revisions do not in any way compensate class members for their alleged injuries. Only two changes are identified in the Settlement Agreement and therefore bind Quorn:

> Quorn will (1) modify the current back or side labels (as applicable) on Quorn Products and statements on its website to remove references to "mushrooms, truffles and morels" as types of "fungi" and (2) state in the allergy warning on the Quorn Product labels that mycoprotein is a "mold (member of the fungi family)" in a prominent location at or near the top of the back and/or side of the product label (as applicable), as more specifically detailed herein.

Settlement Agreement, Dkt. 32-2, at 16.

As for the first revision, the deletion of four words, it appears that Quorn has already begun changing its packaging although the settlement is not approved. A CCAF attorney found that Quorn Vegan Chik'n Cutlets include the same verbiage as before, but simply omits reference to "mushrooms, truffles and morels." *See* Bednarz Decl. ¶¶ 2-3. To the extent Quorn already made this change, the proposed settlement does not provide even hypothetical incremental value to the class. *See Koby*, 846 F.3d at 1080 (defendant "took that step for its own business reasons (presumably to avoid further litigation risk), not because of any court-or settlement-imposed obligation.") (*citing Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877, 882 (7th Cir. 2000)); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 408 (S.D.N.Y. 2015) ("[I]t appears the [alleged misrepresentation] has already been removed from EZ Seed's packaging, and it is not clear what additional injunctive relief plaintiffs seek."). In any event, the revision provides no benefit to class members like Objector Kass who already knew that the fungi kingdom includes mushrooms, truffles, morels, yeast, and mold (including the molds in

Camembert and blue cheese, the mold comprising tempeh, and the molds used to brew sake, rice vinegar, and soy sauce).

As for the second revision to allergy information, it amounts to a meaningless substitution from describing mycoprotein as "a member of the fungi/mold family" to "a mold (member of the fungi family)." All other labelling claims remain intact under the settlement.[11]

Class counsel do not and cannot articulate any reason deleting four words and *slighty* rearranging five words provides value to class members, but the parties bear the burden of proving such benefit under *Koby*. Objector Kass cannot imagine how these revisions could provide her benefit. Kass Decl. ¶ 10. Even if such trivial revisions were valuable, they provide no particular relief to the class of past purchasers, so cannot possibly justify the $2593/hour fees requested.

## CONCLUSION

The structure of the proposed settlement favors attorneys' fees over class recovery, so is fatally infected with self-dealing and should be rejected. If nevertheless approved, attorneys' fees must be reduced to be proportional to actual class recovery. Otherwise, plaintiffs' attorneys will be tempted to deliberately provide substandard notice and onerous claims processes so that they may seek fees based on "alternative fact" settlement values.

---

[11] Objector Kass joins CSPI's observation that the agreement to place the allergy warning in a "prominent" location does not entail any significant change because the warning is already "prominent" as that term is commonly understood in the industry. *See* CSPI Memo. of Law in Opposition to the Parties' Proposed Settlement Agreement, Dkt. 47-1, at 2-5.

Dated: March 30, 2017          Respectfully submitted,


                               */s/ Theodore H. Frank*
                               Theodore H. Frank (SBN 196332)
                               COMPETIVE ENTERPRISE INSTITUTE
                                 CENTER FOR CLASS ACTION FAIRNESS
                               1310 L Street NW, 7th Floor
                               Washington, DC 20036
                               ted.frank@cei.org
                               (202) 331-2263

                               *Attorney for Objector Alida Kass*


    I, Alida Kass, am the objector. I sign my foregoing written objection pursuant to the
Court's Preliminary Approval Order (Dkt. 39) ¶ 20.



_____
Alida Kass

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically served the foregoing on all CM/ECF participating attorneys at their registered email addresses, thus effectuating electronic service under S.D. Cal. L. Civ. R. 5.4(d).

DATED this 30th day of March, 2017.

*/s/ Theodore H. Frank*
Theodore H. Frank

**CERTIFICATE OF SERVICE PURSUANT TO CLASS NOTICE
AND PRELIMINARY APPROVAL ORDER**

Pursuant the requirements of class notice and Preliminary Approval Order, Dkt. 39 ¶¶ 20-21, I hereby certify that on this day I caused service of the forgoing on the following parties, postmarked or emailed as of this date:

| | |
|---|---|
| Atticus Administration<br>Attn: Objection<br>P.O. Box 582959<br>Minneapolis, MN 55458 | *Via First Class Mail* |
| Jason M. Frank, Esq.<br>Scott H. Sims, Esq.<br>Frank Sims & Stolper LLP<br>19800 MacArthur Blvd.<br>Suite 855<br>Irvine, CA 92612<br>eyuhl@yulcarr.com | *Via First Class Mail and Email* |
| Eric Y. Kizirian, Esq.<br>Lewis Brisbois Bisgaard & Smith, LLP<br>633 West 5th Street<br>Suite 4000<br>Los Angeles, CA 90071 | *Via First Class Mail* |

DATED this 30th day of March, 2017.

*/s/ Theodore H. Frank*
Theodore H. Frank